UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CYNTHIA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01987-SEB-DLP |
| | ) | |
| KERRY FORESTAL, in his official capacity | ) | |
| as Sheriff of Marion County, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff in this cause, Cynthia Jones, as personal representative of the Estate of

Miranda Peoples, filed suit against the Marion County Sheriff ("the Sheriff") and Correct

Care Solutions ("CCS") as well as various individual custodial and medical staff

members, asserting claims under 42 U.S.C. § 1983 and various state law claims arising

from the tragic death by suicide of her daughter, Ms. Peoples, while she was incarcerated

at the Marion County Jail ("the Jail"). Now before the Court are the Motion for

Summary Judgment [Dkt. 98] filed by Defendants CCS, Rachel Allen, Lanelle Daniels-

Stringer, and Cyrilene Jones (collectively, "the Medical Defendants") and the Motion for

Summary Judgment [Dkt. 100] filed by Defendants Kerry J. Forestal, in his official

capacity as Sheriff of Marion County, Indiana,[1] Daniel Lee Wayne Williams, Joel Bragg,

---

[1] Plaintiff's First Amended Complaint named as a defendant then-Sheriff John Layton in his
official capacity as Sheriff of Marion County. On January 1, 2019, Sheriff Kerry Forestal was
sworn in as Marion County Sheriff. Thus, Sheriff Forestal is substituted as the party in interest
relating to Plaintiff's official capacity claim against the Marion County Sheriff.

Simon Foxworthy, and Wilbert Gordy (collectively, "the MCSO Defendants"). For the reasons detailed below, we <u>GRANT</u> Defendants' Motions.

**Factual Background**

**Defendants' Policies and Procedures Regarding Suicide Prevention**

CCS has served as the medical provider for the Marion County Sheriff's Office ("MCSO") at the Jail for several years, and throughout that time has always had in effect a suicide prevention program. Martin Decl. ¶ 11. Inmates are initially screened by CCS medical staff for suicide risk and are subsequently reevaluated, if and as necessary, depending on any statements they may make or actions they may take while housed at the Jail. *Id.*; Marshall Decl. ¶ 9, Exh. 1. CCS and its medical staff are responsible for determining whether an inmate should be provided more restrictive/intensive monitoring or placed in suicide segregation. Martin Decl. ¶ 15. Jail personnel, including deputies and detention deputies, do not have access to inmates' health records, which are compiled and maintained by CCS, nor are they provided with information regarding inmates' mental or physical health histories. *Id.*; Daniel-Stringer Dep. at 18–19.

Jail personnel who have frequent inmate contact receive annual training on CCS's suicide prevention procedures in order to assist in identifying potentially suicidal inmates and in intervening to prevent suicide attempts and deaths by suicide. Martin Decl. ¶ 11; Marshal Decl. ¶ 10. The MCSO also provides suicide prevention training for deputies (including detention deputies) at its Training Academy as well as annual training thereafter. All deputies receive 120 hours of training prior to being independently assigned to a particular position as well as annually receive at least forty hours of

additional training.  First-year employee training includes topics such as supervision of inmates, signs of suicide risk, suicide precautions, safety procedures, social/cultural lifestyles of the inmate population, and CPR/first aid.  Annual employee training includes instruction on suicide prevention, including for inmates, identification of mental health problems, appropriate intervention, and treatment.  Martin Decl. ¶ 12.  Deputies are also trained to conduct "clock rounds" at least every sixty minutes for the general population. Clock rounds require deputies to make visual contact and to physically interact with each inmate on an hourly basis.  *Id.* ¶ 13; Marshall Decl. ¶ 11.

The MCSO also trains its deputies in basic first aid/CPR procedures as well as ways to respond to in-custody medical emergencies and deaths.  The first aid/CPR training emphasizes the need to assist an inmate in distress, but also emphasizes the importance of protecting the deputies' health and taking precautions in order to minimize exposure to communicable diseases.  Martin Decl. ¶ 14.  All individual MCSO Defendants named in this lawsuit received this suicide training as well as instruction in basic first aid/CPR.  Marshall Decl. ¶ 16.

**MCSO's Suicide Hotline**

In 2016, the MCSO created and operated a suicide hotline that allows inmates and civilians to report an inmate who has expressed thoughts of self-harm or suicide. Additionally, each time an inmate makes a phone call to civilians outside the Jail, the recipient of the call is played a recorded message instructing them to alert the Jail at the announced telephone number, if they feel the inmate may attempt self-harm or suicide. Martin Decl. ¶¶ 16–17.

When the suicide hotline was first installed, if an inmate was reported as suicidal, the inmate was automatically placed into suicide segregation and referred for a mental health evaluation, regardless of the specific source of the report. However, not long after its implementation, inmates began abusing the suicide hotline, either by making false reports themselves or by enlisting family members to call in false reports in order to get another inmate sent to suicide segregation. *Id.* ¶ 17. These false reports contributed to overcrowding in the suicide segregation area, created a backlog of inmates awaiting mental health assessment, and caused non-suicidal inmates falsely reported as suicidal to lose privileges unnecessarily.[2] *Id.* ¶ 18.

To address the problem of false reports, the Jail implemented a procedure that was in place at the time of Ms. Peoples's June 2017 incarceration. Pursuant to that policy, deputies and detention deputies were instructed to take into account, if possible, the motivation of third-party reports of self-harm or suicidal inclinations before placing an inmate in segregation. *Id.* ¶ 19. To assess the credibility of the suicide reports they received, Jail deputies were to question both the inmate alleged to be suicidal and the inmate who called the suicide hotline to determine whether the caller might have had an ulterior motive in making the report in order to assess their credibility. *Id.* In addition, a

_____

[2] For example, inmates in suicide segregation wear special suicide smocks, are subjected to frequent monitoring (at least every fifteen minutes), are restricted and observed while showering, are denied razors or chemicals for hair removal, are required to eat meals in their cells, and are restricted from any movement to programs, recreational activities, or the library. Martin Decl. ¶ 18.

provision was added to the Inmate Handbook warning that misuse of the suicide hotline constituted a major offense resulting in significant penalties. *Id.*; Marshall Decl. ¶ 13.

**Ms. Peoples's Mental Health and Incarceration History Prior to June 2017**

Ms. Peoples was diagnosed with borderline personality disorder when she was fourteen years old. Cynthia Jones Dep. at 24. According to her mother, as part of her disorder, Ms. Peoples also suffered from bipolar disorder, obsessive compulsive disorder, and schizophrenia, and, although she was thirty-five years old, she "wasn't 35 in her mind." *Id.* at 16, 25.

Ms. Peoples had a lengthy history of encounters with the justice system, resulting in approximately twenty-four stays at the Jail between 2004 and 2017. Beginning at least in 2009, each time she was brought into the Jail, Ms. Peoples underwent a suicide screening and was informed of the Jail's suicide prevention procedures via a video played during the intake process. Martin Decl. ¶¶ 20–21; Exh. 8 to Martin Decl. Additionally, on each of those occasions, Ms. Peoples was given a copy of the Jail's Inmate Handbook, consistent with the practice of providing such to every inmate at intake. The Inmate Handbook contains prohibitions on self-harming behavior and violence and also instructs inmates to seek medical help for both physical and mental health issues experienced while incarcerated. Martin Decl. ¶ 21; Exh. 6 to Martin Decl.

During a prior incarceration in October 2013, inmates reported that Ms. Peoples tried to hang herself, but Ms. Peoples denied doing so. She reported having suicidal thoughts several times during her various incarcerations in 2016; however, once relocated for purposes of maintaining a suicide watch, she stated that she was not in fact suicidal,

but had simply wanted to be moved due to altercations she had with other inmates. Regardless of her motivation for doing so, it is undisputed that Ms. Peoples had on occasions prior to her June 2017 incarceration reported having thoughts of self-harm to Jail staff members.

**Ms. Peoples's June 19, 2017 Receiving Screening**

On June 17, 2017, Ms. Peoples was arrested on drug charges and taken to the Jail.[3] Two days later, on June 19, 2017, Defendant Lanelle Daniels-Stringer, a Registered Nurse employed by CCS, performed Ms. Peoples's intake screening.[4] A book-in photograph was taken of Ms. Peoples, but whether it was taken before or after her intake screening is unknown. Daniels-Stringer Dep. at 110. The Receiving Screening consists of a questionnaire designed to elicit from the inmate her medical history and current medical issues. Medical staff personnel working in the intake area are generally expected to complete fifteen to twenty intakes over the course of each eight-hour shift. Daniels-Stringer Dep. at 45. According to Nurse Daniels-Stringer, "a lot" of inmates say no to every question during the screening in order to get through the process more quickly, particularly if they have been previously incarcerated, and, because the intake area for female prisoners is a communal space where they can be overheard, they frequently will not share all of their medical history. *Id.* at 40, 53–54.

---

[3] Ms. Peoples had been housed at the Jail approximately twenty-five times between 2004 and 2017.

[4] At the Jail, inmates are at times held up to 72 hours in the intake holding tank before they are officially processed. In the holding tank, inmates are permitted to sit, but there is no television or telephone and the toilet is relatively public. Daniels-Stringer Dep. at 103, 111–112.

During her screening, Ms. Peoples reported having a history of Hepatitis C, but denied other physical medical conditions. Despite checking "no" in response to the question regarding illnesses and health problems, Nurse Daniels-Stringer noted on the Receiving Screening form that, during previous periods of incarceration at the Jail, Ms. Peoples had been diagnosed with chronic Hepatitis C on March 16, 2016 and with a psychiatric history "NOS" or "not otherwise specified" on January 10, 2013. Dkt. 99-5 at 1. Nurse Daniels-Stringer did not ask any follow-up questions regarding Ms. Peoples's psychiatric diagnosis or take any action in response, other than continuing to ask Ms. Peoples the questions set out in the Receiving Screening form. Daniels-Stringer Dep. at 79–80.

Nurse Daniels-Stringer checked "no" in the electronic bubble on the Receiving Screening form next to the question regarding allergies. However, in a box directly below the allergy question, she noted allergies to "Ceclor" and "Penicillins." Dkt. 99-5 at 1.

During the Receiving Screening, Ms. Peoples informed Nurse Daniels-Stringer that she used heroin and consumed a six-pack of beer daily and that her last use of these substances was prior to her arrest. *Id.* at 2. Ms. Peoples also stated that, when on previous occasions she had stopped using drugs and alcohol, she suffered withdrawal symptoms, including being unable to sit still and experiencing nausea and vomiting. *Id.* When further inquired of, Ms. Peoples reported that, for the previous twenty years, she had smoked a pack of cigarettes a day. *Id.*

Nurse Daniels-Stringer took Ms. Peoples's vital signs as part of the Receiving Screening process, all of which registered within normal limits. *Id.* at 3. Nurse Daniels-Stringer noted that Ms. Peoples's appearance (sweating, tremors, anxiety, etc.), movements (physical abnormalities, unsteady gait, etc.), and breathing (cough, hyperventilation, shortness of breath, etc.) were all normal and that she did not exhibit characteristics of potentially being at risk for victimization in the Jail. *Id.*

The Receiving Screening includes a Suicide Potential Screening section, which consists of eighteen questions designed to ascertain an individual's suicide risk and determine whether the individual is currently experiencing any thoughts of suicide or other psychiatric problems. The suicide screening form provides that, if affirmative answers are given to certain enumerated questions or if more than eight total affirmative answers are given, the Shift Commander "shall" be notified and an immediate referral to a mental health evaluation is required. *Id.* at 4. Nurse Daniels-Stringer completed Ms. Peoples's suicide screening, recording "no" to every question asked of Ms. Peoples, including whether she had a psychiatric history, had previously attempted suicide, showed signs of depression, or was expressing any suicidal thoughts. *Id.* Nurse Daniels-Stringer also recorded a "no" to the question regarding whether Ms. Peoples appeared under the influence of alcohol or drugs. Had Nurse Daniels-Stringer answered "yes" to that question, she would have been required to answer whether Ms. Peoples was showing signs of withdrawal or mental illness, and if Nurse Daniels-Stringer answered "yes" to that question, she would have been required to refer Ms. Peoples for a mental health consultation. *Id.*

The Receiving Screening also includes a Psychiatric Screening section and a

Prison Rape Elimination Act ("PREA") section. The Psychiatric Screening and the

PREA sections each consist of four questions regarding the individual's current and past

psychiatric issues and past history with physical and sexual assault, respectively. Ms.

Peoples responded "no" to each of the questions in these sections. *Id.* at 5. On the

Current Mental Health checklist, Nurse Daniels-Stringer checked the boxes for "alert,"

"appropriate" affect, "logical" thought process, "appropriate" speech, "appropriate"

mood, and "appropriate" activity/behavior. *Id.*

The Receiving Screening form also included a space for the inmate to sign,

attesting as follows:

> I have answered all questions fully. I have been instructed on and received
> information on how to obtain/access medical services. I have been instructed
> and have received information on sexual assault awareness. I hereby give
> my consent for Correct Care Solutions to provide health care services.

*Id.* at 5–6. According to Nurse Daniels-Stringer, although the signature option appears

on the form, Ms. Peoples did not sign it because the electronic signature function was not

working. In any event, inmates are not able to review their receiving screening forms

because the computers on which the forms are completed cannot be turned to allow

inmates to view the records. Daniels-Stringer Dep. at 118, 120.

After completing the Receiving Screening, Nurse Daniels-Stringer recommended

placement of Ms. Peoples on both the Clinical Institute Withdrawal Assessment

("CIWA") and Clinical Opiate Withdrawal Scale ("COWS") protocols, given her self-

reports of extensive alcohol and drug abuse, but she did not refer her for a mental health

screening.  The CIWA withdrawal protocol is for alcohol and benzodiazepine withdrawal and COWS is for opiate withdrawal.

After recommending these withdrawal protocols, Nurse Daniels-Stringer contacted Nurse Practitioner Cheryl Petty for orders regarding withdrawal protocols and medications.  NP Petty ordered **Ibuprofen** 200 mg., 2 tablets every 8 hours for 7 days; **Meclizine (Antivert)** 25 mg., every 8 hours as needed for nausea/vomiting for 7 days; **Loperamide (Imodium)** 2 mg., 2 tablets as needed for 7 days for diarrhea; and **Chlordiazepoxide (Librium)** 25 mg., every 8 hours for 3 days.  Nurse Daniels-Stringer entered these orders into Ms. Peoples's electronic medical record.  Dkt. 99-5 at 9–10, 12.

**The CIWA and COWS Protocols**

The CIWA and COWS withdrawal protocols require frequent assessments of inmates who are going through withdrawal from drugs and alcohol.  Generally, CIWA assessments are made every 8 hours for at least 72 hours and then twice per day for the next 48 hours.  *See id.* at 13–14.  COWS assessments are typically performed every 8 hours until the COWS score remains below 12 (out of a possible 48) for 72 hours.  *Id.* at 15.  Each assessment begins with the medical staff person taking the inmate's vital signs, which are recorded on the CIWA and COWS assessment forms.  *See id.* at 13–15.

The CIWA and COWS forms include a list of withdrawal symptoms concerning which the inmate is evaluated by the medical staff at each assessment, including nausea/vomiting, tremors, paroxysmal sweating, agitation, tactile/auditory/visual disturbances, anxiety, headaches/fullness in head, and orientation for the CIWA protocol; and resting pulse rate, tremor, sweating, GI upset, restlessness, yawning, pupil size,

anxiety/irritability, bone/joint aches, skin, and runny nose/tearing for the COWS protocol. *See id.* A maximum total score on the CIWA assessment reflecting serious problems is 67, with scores of 0 to 9 indicating "minimal or no withdrawal," scores of 10 to 16 being "mild to moderate," scores of 16 or greater indicating "moderate to severe" withdrawal, and 20 or greater being "severe." *See id.* at 13–14. The maximum total (negative) score on the COWS assessment is 48, with scores below 12 considered "mild." *See id.* at 15.

As part of both the CIWA and COWS assessments, the medical staff is required to ask the inmate the following four questions (hereafter, "the Behavioral Health Screening Questions"): (1) whether the inmate is expressing thoughts of self-harm; (2) whether the inmate has had a negative visit or phone call with family or friends since her last nursing encounter; (3) whether the inmate has experienced a negative outcome from court/video court since her last nursing encounter; and (4) whether the inmate is expressing feelings "that there is nothing to look forward to … feelings of hopelessness or helplessness…." *See id.* at 13.

CCS medical staff members contact a doctor regarding a CIWA/COWS inmate generally only if their overall score is too high or if they have answered the Behavioral Health Screening Questions affirmatively. Allen Dep. at 54. Certain questions overlap between the CIWA and COWS assessments and some nurses ask the overlapping questions twice while others simply fill in the previously given answer the second time. Daniels-Stringer Dep. at 151; Allen Dep. at 121–22. Often inmates get into a "drum roll" style pattern of answering, and, according to Nurse Daniels-Stringer, Ms. Peoples's CIWA and COWS protocols likely were completed in approximately one minute's time

by asking each question sequentially, one after another. Daniels-Stringer Dep. at 151. In addition to the questions on the protocol forms, when conducting the withdrawal assessments, medical staff also observe an inmate's presentation and ask the inmate to perform small physical tasks, such as sticking out her tongue. *Id.* at 128.

At the time of what turned out to be Ms. Peoples's final incarceration, the CIWA and COWS protocol forms were handwritten and completed during medication pass, and thereafter stored in a binder maintained on the medication carts. Allen Dep. at 47. The forms were scanned into CCS's electronic records system on the last day of the protocols, which usually extended over any time period from five to seven days. *Id.* at 48; Daniels-Stringer Dep. at 123, 132. Accordingly, until the forms were uploaded on the electronic site at the completion of the protocol, the assessment information was available to view only on the handwritten copy.

**Ms. Peoples's Initial CIWA and COWS Assessments**

Nurse Daniels-Stringer performed Ms. Peoples's initial CIWA and COWS assessments as part of the intake process on June 19, 2017. Nurse Daniels-Stringer first recorded Ms. Peoples's vital signs. She next assessed Ms. Peoples's withdrawal symptoms, scoring Ms. Peoples a "1" for nausea/vomiting, tremors, sweating, agitation, anxiety, and a "2" for headache, for a total score of 7 out of a maximum of 67, which indicated "minimal or no withdrawal." *Id.* at 13. Nurse Daniels-Stringer recorded that Ms. Peoples responded "no" to each of the four Behavioral Health Screening Questions. *Id.*

Immediately following the CIWA assessment, Nurse Daniels-Stringer conducted Ms. Peoples's initial COWS assessment. Nurse Daniels-Stringer recorded Ms. Peoples's vital signs and noted that Ms. Peoples was reporting tremors, sweating, GI upset, anxiety, and bone/joint aches. *Id.* at 15. Based on these symptoms, Nurse Daniels-Stringer gave her a score of 10 out of a maximum of 48 points (a "1" for tremors, sweating, restlessness, and anxiety/irritability and a "2" for GI upset, bone/joint aches, and runny nose/tearing). *Id.* Ms. Peoples again responded "no" to each of the four Behavioral Health Screening Questions. *Id.*

Following these assessments, Ms. Peoples was given a copy of the Jail's Inmate Handbook and assigned to block 2 West, cell 5, which was a general population block. Bair Decl. ¶ 10; Exh. 2 to Bair Decl. The record indicates that Ms. Peoples also viewed the suicide prevention procedures video during the intake process. Exh. 2 to Bair Decl.

**Ms. Peoples's Second Day in Jail – June 20, 2017**

Ms. Peoples's June 20, 2017 medical records reflect that she was given a COWS assessment at 1:00 a.m. and a CIWA assessment at 1:20 a.m., on which she received a total score of "2" on both assessments, meaning there were few to no withdrawal symptoms. Ms. Peoples also answered "no" to each of the four Behavioral Health Screening Questions during these assessments. Dkt. 99-5 at 15. At the 1:00 a.m. medication pass, Nurse Clarissa Batteast administered Librium and Ibuprofen to Ms. Peoples. At 1:17 a.m., Nurse Batteast administered Antivert to Ms. Peoples, per her request. *Id.* at 25–29.

At 9:15 a.m., Ms. Peoples was administered a second CIWA assessment. Her medical records indicate that her vital signs were checked and that she was experiencing no withdrawal symptoms at that time. She also responded "no" to each of the Behavioral Health Screening Questions. *Id.* at 13. During the 9:00 a.m. medication pass, Nurse Lori Sparks administered Librium, Ibuprofen, and Thiamine to Ms. Peoples. *Id.* at 25–29.

Defendant Rachel Allen, a Licensed Practical Nurse ("LPN") employed by CCS, conducted Ms. Peoples's third CIWA assessment at 5:00 p.m. on June 20, 2017. It appears from the notations on the form that Nurse Allen originally scored Ms. Peoples at a "0" in each withdrawal symptom category, but ultimately gave her a score of "1" for tremors, headaches, anxiety, and a "2" for nausea/vomiting. Although the total score therefore should have been "5," Nurse Allen miscalculated a total score of "4". *Id.* at 13. With regard to the headache, Nurse Allen scored Ms. Peoples a "1" because she had asked for Ibuprofen, but Nurse Allen believed she just wanted pain medication. Allen Dep. at 110. Nurse Allen drew a line down the row of "N" options for the four Behavioral Health Screening Questions. Dkt. 99-5 at 13. Nurse Allen also completed Ms. Peoples's second COWS assessment at that time, scoring her "1" for tremors and anxiety/irritability and "2" for GI upset, for a total score of "4." *Id.* at 15. Nurse Allen again drew a line down the row of "N" options for the Behavioral Health Screening Questions. *Id.*

At 8:51 p.m., Nurse Allen administered Imodium and Antivert to Ms. Peoples, per her request. *Id.* at 25–26. At the 9:00 p.m. medication pass, Nurse Allen administered

Librium and Ibuprofen to Ms. Peoples.  *Id.* at 25–29.  Nurse Practitioner Petty ordered

Thiamine (Vitamin B1) for Ms. Peoples at a dose of one 100 mg. tablet for 30 days.

**Ms. People's Third Day in Jail – June 21, 2017**

On June 21, 2017, Ms. Peoples was again administered the CIWA assessment at

1:00 a.m.  Her medical records show that she was experiencing nausea/vomiting and

headaches for which a total score of "2" was assessed, indicating minimal to no signs of

withdrawal.  *Id.* at 13.  Ms. Peoples again responded "no" to each of the Behavioral

Health Screening Questions.  *Id.*  At 1:10 a.m., Ms. Peoples was given the COWS

assessment.  *Id.* at 15.  Ms. Peoples reported suffering from bone/joint aches, which was

assessed at a total score of "2."  *Id.*  Ms. Peoples again answered "no" to the Behavioral

Health Screening Questions.  *Id.*  During the 1:00 a.m. medication pass, Nurse Batteast

administered Librium and Ibuprofen to Ms. Peoples.  *Id.* at 25–29.

At the 9:00 a.m. medication pass, Nurse Nakia Murrell administered Librium,

Ibuprofen, and Thiamine to Ms. Peoples.  *Id.*  At 5:00 p.m., Ms. Peoples was given a

second CIWA assessment.  Her vital signs were taken and no withdrawal symptoms were

recorded.  *Id.* at 13.  Her medical records indicate that she again answered "no" to all four

Behavioral Health Screening Questions.  *Id.*

During the 9:00 p.m. medication pass, Nurse Ashley Ellis administered Librium

and Ibuprofen to Ms. Peoples.  *Id.* at 25–29.

**Ms. Peoples's Fourth Day in Jail – June 22, 2017**

On June 22, 2017, at 1:00 a.m., Ms. Peoples was given another CIWA assessment.

Her vital signs were taken, and she was given a "1" for nausea/vomiting and headaches,

for a total score of "2," indicating minimal to no withdrawal symptoms. *Id.* at 13. As usual, Ms. Peoples responded "no" to the Behavioral Health Screening Questions. *Id.* At 1:10 a.m., Ms. Peoples's COWS assessment was performed. Her medical records show that she was experiencing sweating and anxiety/irritability generating a total score of "2." *Id.* Ms. Peoples again responded "no" to the Behavioral Health Screening Questions. *Id.* During the 1:00 a.m. medication pass, Nurse Batteast administered Librium and Ibuprofen to Ms. Peoples. *Id.* at 25–29. At Ms. Peoples's request, Nurse Batteast also administered her Antivert. *Id.* at 26.

During the 9:00 a.m. medication pass, Defendant Cyrilene Jones, an LPN employed by CCS, administered Librium, Ibuprofen, and Thiamine to Ms. Peoples. *Id.* at 25–29. At 9:33 a.m., Nurse Jones administered Antivert to Ms. Peoples, per her request. *Id.* at 26. At 9:35 a.m., Nurse Jones performed a second CIWA assessment of Ms. Peoples, noting that she was experiencing nausea/vomiting, anxiety, and headaches, assessing her at a total score of "4," which indicates minimal to no withdrawal symptoms. *Id.* at 13. Nurse Jones recorded that Ms. Peoples had responded "no" to the Behavioral Health Screening Questions. *Id.*

Just after 9:00 p.m., Ms. Peoples received her third CIWA assessment of the day, receiving a total score of "2" based on nausea/vomiting and anxiety; she again responded "no" to the Behavioral Health Screening Questions. *Id.* at 14. During the 9:00 p.m. medication pass, Nurse Helen Johnson administered Librium and Ibuprofen to Ms. Peoples. *Id.* at 25–29.

**Ms. Peoples's Fifth Day in Jail – June 23, 2017**

On June 23, 2017, Nurse Murrell administered Ibuprofen to Ms. Peoples during the 1:00 a.m. medication pass. *Id.* At 9:00 a.m., Ms. Peoples was given a score of "4" on her CIWA assessment based on nausea/vomiting and anxiety symptoms. Ms. Peoples responded "no" to the four Behavioral Health Screening Questions. *Id.* at 14. During the 9:00 a.m. medication pass, Nurse William Civils administered Librium, Ibuprofen, and Thiamine to Ms. Peoples. *Id.* at 25–29. At 10:33 a.m., Nurse Civils administered Imodium and Antivert to Ms. Peoples, per her request. *Id.* at 25–26.

Later that day, Defendant Daniel Lee Wayne Williams, a Sheriff's deputy with the MCSO assigned to Jail security, encountered Ms. Peoples during a mealtime as an elderly inmate assisted Ms. Peoples as she got her food. Deputy Williams remembers Ms. Peoples being physically ill from detoxing and having trouble walking normally as a result. According to Deputy Williams, Ms. Peoples's equilibrium was off and the older inmate was helping Ms. Peoples balance to prevent her from falling. Williams Dep. at 27–30.

At 9:00 p.m., Nurse Allen performed a second of the day CIWA assessment on Ms. Peoples. Nurse Allen took Ms. Peoples's vital signs and recorded that she was experiencing nausea/vomiting, sweating, anxiety, and headaches generating a total score of "6," but still indicating minimal or no withdrawal. Dkt. 99-5 at 14. Ms. Peoples also scored a "6" on the COWS assessment performed by Nurse Allen based on tremors, sweating, GI upset, anxiety/irritability, and bone/joint aches. *Id.* at 15. Nurse Allen noted that Ms. Peoples had again responded "no" to the Behavioral Health Screening Questions during both the CIWA and the COWS assessments. *Id.* Nurse Allen

administered Librium and Ibuprofen to Ms. Peoples during the 9:00 p.m. medication pass. *Id.* at 25–29. At 9:23 p.m., Nurse Allen administered Imodium and Antivert, per Ms. Peoples's request. *Id.* at 25–26.

Deputy Williams again encountered Ms. Peoples during the evening medication pass, around 9:00 or 10:00 p.m. He could tell that she was still not feeling well because she was moving slowly and mumbled when she spoke. Williams Dep. at 30–31. Deputy Williams did not notify medical staff that Ms. Peoples appeared ill because he knew she was already on the withdrawal protocols and therefore being monitored by the medical staff. *Id.* at 122–23.

**Ms. Peoples's Sixth Day in Jail – June 24, 2017**

The final day of Ms. Peoples's CIWA and COWS withdrawal protocols was June 24, 2017. At 1:00 a.m. that day, Ms. Peoples was administered a COWS assessment. She scored a "2" based on anxiety/irritability. Dkt. 99-5 at 15. Ms. Peoples answered "no" to the Behavioral Health Screening Questions. *Id.* During the 1:00 a.m. medication pass, Nurse Batteast administered Ibuprofen to Ms. Peoples. *Id.* at 25–29.

At 9:00 a.m., a nurse performed a CIWA assessment on Ms. Peoples and recorded that she was experiencing nausea/vomiting, sweating, anxiety, and headaches. Ms. Peoples was given a score of "5" based on these symptoms. She again answered "no" to the Behavioral Health Screening Questions. *Id.* at 14. Nurse Civils administered Ms. Peoples Librium, Ibuprofen, and Thiamine during the 9:00 a.m. medication pass. At 9:54 a.m., Nurse Civils administered Antivert to Ms. Peoples, per her request. *Id.* at 26.

During the 9:00 p.m. medication pass, Nurse Batteast administered Ibuprofen to Ms. Peoples. *Id.* at 25–29.

Later that same evening, an unknown inmate pressed the emergency button in the 2 West block where Ms. Peoples was housed and reported that an inmate wanted to hurt herself. Williams Dep. at 72–73. The inmate who made the report did not provide her name, the name of the other inmate, or any other information identifying the inmate who wanted to self-harm. *Id.* Jail personnel requested that the deputies and detention deputies overseeing 2 West perform a welfare check and headcount on the block. *Id.* at 72, 75. Deputy Williams, along with another deputy, entered 2 West to perform the welfare check. The deputies attempted to identify the inmate who activated the emergency button, but no inmate admitted to doing so. *Id.* at 73–74. The deputies then ordered the women in 2 West to go into their cells and proceeded to visit each cell asking for information regarding the inmate responsible for the alarm. *Id.* at 74–75. Again, no one admitted to pressing the emergency button. *Id.* at 119. According to records from the MCSO's internal investigation, Deputy Williams spoke with Ms. Peoples at this time and she "stated that she was fine." Exh. 6 to Bair Decl.

During his rounds later that same night, at some point between 11:00 p.m. and midnight, Deputy Williams noticed that Ms. Peoples's cellmate, Ashley Hardy, was not in the cell with Ms. Peoples. *Id.* at 34–38. After making this discovery, Deputy Williams woke Ms. Peoples and asked her if she knew where Ms. Hardy was and why she was not in the cell. *Id.* at 36–37. Ms. Peoples responded that she did not know. *Id.* at 37. Deputy Williams and the other deputy conducting the headcount with Williams found

Ms. Hardy in another cell and returned her to her assigned cell with Ms. Peoples.  *Id.* at 37–38.

Deputy Williams testified that Ms. Hardy then asked him whether Ms. Peoples could be moved to suicide segregation and stated that she thought Ms. Peoples was suicidal.  *Id.* at 49.  Ms. Hardy denies ever reporting Ms. Peoples as suicidal.  Hardy Dep. at 26.  Deputy Williams testified that he immediately went to Ms. Peoples and asked her if she ever talked about hurting herself or felt like she wanted to hurt herself.  According to Deputy Williams, Ms. Peoples responded, "[N]o.  I don't talk to her [Ms. Hardy]. All I want to do is sleep."  Williams Dep. at 49–50.  This conversation as such was not entered into the internal investigation report.[5]  Exh. 6 to Bair Decl.

After her denial, Deputy Williams did not ask Ms. Peoples any additional questions but returned to Ms. Hardy and asked if she had any reason to assume Ms. Peoples was suicidal.  Ms. Hardy allegedly responded, "[N]o, I just don't want to share a room with her."  *Id.* at 50.  Again, Ms. Hardy claims that she never reported Ms. Peoples as suicidal, so she maintains that this conversation with Deputy Williams did not take place.

---

[5] The relevant portion of the internal investigation report provides as follows: "Dep. Williams was told by an inmate that Inmate Hardy was the one that hit the emergency button, stating that someone in the block was suicidal.  The inmate had said that Hardy just wanted Peoples, her bunky roommate, out of the cell due to her vomiting and slobbering.  Inmate Hardy had attempted to switch cells earlier without gaining permission from deputies.  Dep. Williams stated that he felt that she was trying to get Inmate Peoples reassigned to a different cell so Inmate Hardy wouldn't have to bunk with her."  Exh. 6 to Bair Decl.

Deputy Williams did not refer Ms. Peoples to mental health or otherwise contact the medical staff to alert them to the report that Ms. Peoples was suicidal because he had determined that the report from Ms. Hardy was not credible. *Id.* at 55.

**Ms. People's Seventh Day in Jail – June 25, 2017**

On June 25, 2017, during the 1:00 a.m. medication pass, Nurse Shantal Washington administered Ibuprofen to Ms. Peoples. Dkt. 99-5 at 25–29. While Ms. Peoples was out of her cell getting her meds, Deputy Williams observed Ms. Hardy trying for a second time to switch cells. She had her mattress and all her property with her. Williams Dep. at 40–41. Ms. Hardy was again returned to her assigned cell with Ms. Peoples. *Id.* at 43. Ms. Hardy denies attempting to switch cells a second time, claiming she did so only once. Hardy Dep. at 26.

At approximately 2:40 a.m., while accompanying a nurse on a medication pass, Deputy Williams noticed Ms. Hardy standing outside her cell yelling at Ms. Peoples. Ms. Hardy claims no such argument occurred. *Id.* Deputy Williams and the other deputies with him pulled Ms. Hardy out of the cell in block 2 West and placed her in 2 East holding. Following this incident, Deputy Williams documented his interactions with Ms. Hardy, recommending that she be disciplined with one minor violation and four minor violations, which included "falsely stat[ing] that inmate Peoples was suicidal in an attempt to get inmate Peoples out of housing block 2W." Dkt. 102-4 at MCSO_004826. According to Deputy Williams, he concluded that Ms. Hardy's statement was false based on her lack of sincerity, her numerous attempts to switch cells to get away from Ms.

Peoples, and the fact that she had asked to be moved prior to ever mentioning that she believed Ms. Peoples was suicidal.  Williams Dep. at 91, 108.

Later that morning, Ms. Peoples was out of the unit during the 9:00 a.m. medication pass so she did not receive her usual doses of Ibuprofen and Thiamine at that time.  Nurse Washington administered Ibuprofen to Ms. Peoples during the 9:00 p.m. medication pass.  Dkt. 99-5 at 25–29.

**Ms. People's Eighth Day in Jail – June 26, 2017**

On June 26, 2017, Nurse Batteast administered Ibuprofen to Ms. Peoples during the 1:00 a.m. medication pass.  *Id.*  During the 9:00 a.m. medication pass, Nurse Jones was administering medication and Ms. Peoples refused her Thiamine (Vitamin B1) and Ibuprofen.  *Id.*  These medications are prescribed to help relieve the symptoms of withdrawal and Ms. Peoples's withdrawal protocol was at this point complete.  Cyrilene Jones Aff. First ¶ 4.[6]  According to Nurse Jones, there was no need to contact a doctor regarding Ms. Peoples's refusal to take her medications because "[p]atients have a right to refuse medication and Thiamine and Ibuprofen were not critical medications for a critical condition."  *Id.* ¶ 6.

In addition to refusing her Thiamine and Ibuprofen, Ms. Peoples may have also told Nurse Jones at that time that she wanted her Librium dose.  Nurse Jones knows this exchange occurred during one of Ms. Peoples's incarcerations but is unable to recall whether it was during the incarceration at issue in this case or on another prior occasion

---

[6] Nurse Jones's affidavit includes two paragraphs numbered as "4."

when Ms. Peoples was housed in the Jail.  In any event, Ms. Peoples's Librium prescription had expired, and Nurse Jones did not report Ms. Peoples's request to a doctor because "the provider's prescription for Librium was completed and Ms. Peoples was through withdrawal at that point."  *Id.*  Nurse Jones avers that she did not observe signs of suicidal or self-harming behavior at any point during her encounters with Ms. Peoples. *Id.* Second ¶ 4.

Around 6:20 p.m. that evening, Ms. Peoples called her mother, Ms. Jones, and the two spoke for approximately fifteen minutes.  Bair Decl. ¶ 11; Exhs. 3, 4 to Bair Decl. Following this conversation, Ms. Jones did not call the suicide hotline or otherwise report to the Jail any concerns regarding Ms. Peoples's mental state.

About two hours later, between 8:13 and 8:15 p.m., Defendant Wilbert Gordy, a detention deputy, and Sgt. Erich Gephart entered block 2 West to perform the required clock rounds.  Deputy Gordy was assigned to the first floor, so he did not see Ms. Peoples because her cell was on the second floor.  Sgt. Gephart was responsible for the second floor and reported that Ms. Peoples's cell door was ajar and that she "was alert and seemed fine" at that time.  Exh. 6 to Bair Decl.

**Ms. Peoples's Suicide**

At 8:48 p.m., approximately thirty minutes after Deputy Gordy and Sgt. Gephart performed their required clock rounds, detention deputies received a call from the control operator stating an inmate had fallen inside the 2 West block, where Ms. Peoples was being held.  Gordy Dep. at 20, 51; Bragg Dep. at 34, 151–52.  Nurse Allen was passing medication to inmates/patients in the 2 East block of the Jail at this time, when she heard

screams coming from the 2 West block.  Deputy Gordy and another detention deputy, Defendant Joel Bragg, both responded to the call, as did Nurse Allen.  Gordy Dep. at 20; Bragg Dep. at 41, 43–44; Allen Dep. at 69–71.  Deputies Gordy and Bragg entered the block first, followed by Nurse Allen.  Gordy Dep. at 24; Bragg Dep. at 44; Allen Dep. at 72.  When they arrived, various female inmates were frantic and said that an inmate had fallen and hit her head, and someone mentioned that she was not breathing.  Bragg Dep. at 45–47.  Nurse Allen remembers being told that Ms. Peoples had fallen from her bunk and was purple.  Allen Aff. ¶ 6.  After being told of the incident in Cell 5, Nurse Allen and Deputies Gordy and Bragg ran up the stairs to the top tier of block 2 West to Ms. Peoples's cell.  Gordy Dep. at 26; Bragg Dep. 47–48; Allen Dep. 71–72.

When they arrived at Ms. Peoples's cell, the door was open only partway, making it difficult to see all the way inside.  Gordy Dep. at 27.  According to Deputies Bragg and Gordy, the door should have been completely open.  *Id.* at 11–12; Bragg Dep. at 108.

Deputy Bragg was the first to enter Ms. People's cell and Deputy Gordy entered right after him.  Gordy Dep. at 26–27; Bragg Dep. at 49.  They observed Ms. Peoples hanging in what Deputy Gordy described as almost a seated position with a sheet that was tied around her neck as well as around the top bunk.  Gordy Dep. at 28–29; Bragg Dep. at 52.  Deputy Bragg radioed for immediate assistance for an attempted suicide and medical emergency.  Bragg Dep. at 48–49, 54.  Deputy Gordy immediately began attempting to loosen the knot that was tied around the bunk while Deputy Bragg maneuvered Ms. Peoples's body to assist Gordy's efforts.  *Id.* at 56; Gordy Dep. at 30–31.  Mr. Bragg, who is 5'7" tall and weighed approximately 245 pounds at the time, held

up Ms. Peoples's torso from behind, under her armpits, with his palms up high and open toward the ceiling in an attempt to push her body upwards while Mr. Gordy, who is 6'3" and weighed between 280 and 285 pounds, attempted to loosen the ligature. Bragg Dep. at 56–58, 97. Mr. Bragg used only his arms to lift Ms. Peoples and testified that he was not physically capable of lifting her off the ground. *Id.* at 58. Deputies Bragg and Gordy continued maneuvering in this fashion for approximately thirty to sixty seconds but were unable to remove the ligature. *Id.* at 59. Neither deputy radioed for someone to retrieve the cutdown tool or left the scene to retrieve it themselves, instead focusing on loosening the knot to release Ms. Peoples. Gordy Dep. at 48.

Both Deputy Bragg and Deputy Gordy concede that they had been trained to use the cutdown tool—which is similar to a seatbelt cutter—to remove a ligature, rather than attempting to remove it manually. Bragg Dep. at 149–50; Gordy Dep. at 47–48, 50, 71. At the Jail, the cutdown tool is typically stored on the floor outside the individual cell blocks in a metal box with a breakable seal. Bragg Dep. at 63. During their training, the cutdown tool was close by and readily available, but Deputy Bragg testified that he had to improvise in this case because the cutting tool was not readily accessible. *Id.* at 150.

Defendant Simon Foxworthy and another detention deputy, Justin Dillehay, also heard the call regarding a medical emergency in block 2 West. Foxworthy Dep. at 41–42. After Deputies Foxworthy and Dillehay entered 2 West, they ran up the stairs to Ms. Peoples's cell. *Id.* at 44, 46. Deputy Foxworthy observed Ms. Peoples hanging from the top bunk and he immediately radioed for medical assistance and instructed Deputy Dillehay to run quickly to retrieve the cutting tool and AED. *Id.* at 52. Deputy

Foxworthy then entered the cell and began assisting Deputies Bragg and Gordy.  He did not wait for Deputy Dillehay to return with the cutdown tool because he believed he needed to act quickly to try to save Ms. Peoples.  *Id.* at 55.  With Deputy Foxworthy's assistance in lifting Ms. Peoples's body, Deputy Gordy was able to loosen the knot on the bunk, which slackened the sheet around Ms. Peoples's neck, allowing the deputies to remove the sheet from her neck, lower her to the ground, and place her on her back on the floor of the cell.  *Id.* at 46, 52–53, 69; Gordy Dep. at 31–36; Bragg Dep. at 67, 69.

Deputy Gordy testified that Nurse Allen was "right behind" him and Deputy Bragg when they entered the cell.  Gordy Dep. at 24.  Deputy Bragg was unable to recall what Nurse Allen was doing to assist at this point, remembering only that she was standing behind them while they were attempting to loosen the knot.  Bragg Dep. at 59.  Nurse Allen, however, testified that she had assisted the deputies in their attempts to remove the ligature and that they were immediately able to remove it from Ms. Peoples's neck.  Allen Dep. at 76.

Once Ms. Peoples was placed on the floor of the cell, Deputy Bragg observed that Ms. Peoples's skin was blue and white, her face was completely discolored, her tongue was blue and sticking out of her mouth, her eyes were open, and there was a large amount of reddening, blueness, and whiteness to her neck.  Bragg Dep. at 68.  Her eyes were dilated, extremely red, and bloodshot.  *Id.* at 69.  Nurse Allen observed that Ms. Peoples's pupils were fixed, she had ligature marks on her neck, and her skin was mottled and purple in color.  Allen Aff. 6.

Deputy Bragg checked for a pulse around Ms. Peoples's neck and on her wrists and immediately started chest compressions when he could not find a pulse. Bragg Dep. at 69. He could not estimate the pace at which he administered the chest compressions, but after he performed a series of chest compressions—approximately thirty to forty-five seconds—Deputy Bragg became exhausted, and Deputy Foxworthy swapped places with him and continued chest compressions. *Id.* at 69–70, 73, 78, 80; Foxworthy Dep. at 76. There was no coordinated changeover; Deputy Bragg simply stepped away and Deputy Foxworthy took his place. Bragg Dep. at 79–80. Deputy Foxworthy had also been unable to find Ms. Peoples's pulse and noticed that her eyes were non-reactive and her chest did not appear to be rising and falling. Foxworthy Dep. at 65–66.

The MSCO deputies and the CCS medical staff are all trained to perform a cycle of chest compressions followed by two breaths and to continue that pattern until medical staff or paramedics arrive. Allen Dep. at 17, 133; Bragg Dep. at 72–74; Gordy Dep. at 66–67. However, neither deputy performing CPR on Ms. Peoples had a face shield to prevent the transmission of disease, so they did not attempt mouth-to-mouth breathing and instead performed only chest compressions. Foxworthy Dep. at 70, 77–78. Although she was at that point the only member of the medical staff at the scene, Nurse Allen did not attempt to intervene in CPR efforts because "there would be no reason for [her] to," given that chest compressions were already being performed, and, per her training, were not supposed to be interrupted. Allen Dep. at 78–79.

According to the deputies, approximately two to three minutes after Ms. Peoples had been placed on the floor in her cell, Deputies Bragg, Gordy, and Foxworthy moved

her to a space outside her cell because there was insufficient space inside the cell to maneuver.  Foxworthy Dep. at 69, 80; Gordy Dep. at 37–39; Bragg Dep. at 80, 83.  Once Ms. Peoples was moved, chest compressions resumed.  Bragg Dep. at 84–85.  Ms. Allen, however, testified that it was only a matter of a few seconds between the time when she walked into the cell, Ms. Peoples was moved to the area outside the cell, and she traded off chest compressions with Deputies Bragg and Foxworthy for approximately two minutes, until additional medical staff arrived.  Allen Dep. at 79.

At 8:51 p.m., three minutes after the emergency button had first been activated, additional CCS medical staff, including Nurses Helen Johnson, Marsha Williams, Tamara Lavett Whitlow, and Tracy Roberts, arrived on the scene and took over medical treatment.[7]  *Id.* at 86–87; Foxworthy Dep. at 74; Allen Aff. ¶ 6; Dkt. 99-5 at 16–24. Deputy Dillehay returned to the scene with the cutting tool at the same time medical staff was responding.  Bragg Dep. at 88; Foxworthy Dep. at 55, 67–68.  CCS medical staff continued chest compressions, applied an AED, and administered oxygen to Ms. Peoples via an Ambu bag.  Bragg Dep. at 93–94; Foxworthy Dep. at 74, 82–83; Allen Dep. at 82–84; Dkt. 99-5 at 16–24.  Deputies Bragg, Gordy, and Foxworthy left the scene after CCS medical staff took over Ms. Peoples's attempted recovery efforts.  Gordy Dep. at 41; Bragg Dep. at 101–103; Foxworthy Dep. at 82.  Paramedics arrived at approximately 9:05 p.m., at which point they took over rescue efforts.  Sadly, Ms. Peoples was pronounced dead at 9:45 p.m.

---

[7] No medical supervisors, only LPNs, responded to the scene.  Allen Dep. at 88.

**Testimony of Ashley Hardy**

Ms. Hardy was incarcerated in the Jail from May 1, 2017 through June 26, 2017 and was housed with Ms. Peoples for a few days near the end of that period, from approximately June 23 to June 25, 2017, until Ms. Hardy was moved to the 2 East block. Ms. Peoples was "really sick" and "struggling" when Ms. Hardy first encountered her. Hardy Dep. at 10–12. The first night they were housed together, Ms. Peoples "threw up all over [the] cell in the middle of the night and she kept getting sick." *Id.* at 10. Ms. Peoples was unable to clean up her vomit or the menstrual blood on her clothes and had no cleaning supplies available to her. When Ms. Hardy asked jail staff for help with the situation, they "did nothing and laughed." *Id.* at 36.

While they were housed together, Ms. Peoples continued experiencing what Ms. Hardy believed to be obvious withdrawal symptoms, including repeated vomiting, constant sweating, restlessness at night, diarrhea, and anxiety. *Id.* at 10–11, 13–14, 18, 34–35, 42, 63. Ms. Peoples would often wake Ms. Hardy at night to talk and would cry after she spoke on the telephone with her family. *Id.* at 11, 31. Ms. Hardy testified that she believed Ms. Peoples was depressed because "[s]he was anxious, sweating all the time, lonely. … [S]he would wake me up in the middle of the night and kind of be rocking back and forth and want to talk to me …. So she was obviously going through some things." *Id.* at 18. According to Ms. Hardy, Ms. Peoples's withdrawal symptoms did not improve at all throughout the time they were housed together. *Id.* at 64.

Ms. Hardy remembers three or four occasions when Ms. Peoples told various unidentified detention deputies and nurses that she was depressed and lonely, that she

needed mental health care, and that she wanted medication.  *Id.* at 12, 24, 30.  In response, Ms. Peoples was advised to complete a health care request form, but Ms. Hardy never saw her do so.  *Id.* at 65, 69–70.  Ms. Hardy did not observe anyone on the medical staff examine Ms. Peoples in her cell or remove Ms. Peoples from the cell block to perform a mental health check nor did anyone from the corrections staff perform a welfare check on Ms. Peoples while Ms. Hardy was incarcerated with her.  *Id.* at 18, 45.  Ms. Hardy concedes she was not aware of what medications were being administered to Ms. Peoples or the specific medical treatment she was receiving but "whatever it was, it wasn't good.  She was still really, really struggling."  *Id.* at 35.  According to Ms. Hardy, "[i]t doesn't take a doctor to see she was struggling, and she said so herself."  *Id.* at 66.

Ms. Hardy was aware that a number of inmates were giving Ms. Peoples a hard time during her incarceration.  According to Ms. Hardy, these other inmates would stare down Ms. Peoples, shoulder-check her, "talk shit" about her when she would get her food at mealtimes and ask whether "she had any money on her books yet."  *Id.* at 38–39.  Ms. Hardy testified that she did not report this conduct because she had "no reason to suspect that it was anything serious."  *Id.* at 40.  She also claims to have observed that jail and medical staff were unkind to Ms. Peoples and that jail staff in general were "horrible" and did not take any interest in inmates who were exhibiting visible signs of distress.  *Id.* at 43, 57–58.

Although she now reportedly regrets failing to do so, Ms. Hardy never reported Ms. Peoples as being suicidal because "I didn't think that—I don't know whether or not she was suicidal.  I've never really been in that situation before.  I just knew she was

depressed, and she was really, really sick." *Id.* at 21. Ms. Hardy claims she "never had any suicide prevention training or training to recognize the risk of suicide." *Id.* at 38. She believes another inmate made the anonymous report that Ms. Peoples was suicidal not based on any belief that she was in fact suicidal but merely to get her moved out of the cell block. *Id.* at 22. According to Ms. Hardy, in the Jail, "people … play suicide on each other all the time" and "[w]hen somebody gets mad at somebody else, they'll call suicide on them." *Id.*

As noted above, Ms. Hardy was moved out of the cell she shared with Ms. Peoples on June 25, 2017. Ms. Hardy was released from the Jail the next day, at some point prior to Ms. Peoples's suicide on the evening of June 26, 2017. *Id.* at 27.

**Jeffrey L. Samelson's Expert Testimony**

Jeffrey L. Samelson, Ph.D., HSPP, a licensed clinical psychologist in practice since 1977, reviewed the facts of this case, including Ms. Peoples's medical records, medical and incarceration history, and jail telephone calls made by Ms. Peoples.

Based upon his review, Dr. Samelson concluded that the health screening tool used by Nurse Daniels-Stringer during Ms. Peoples's intake screening was reasonable, appropriate, and within the applicable standard of care for mental health and suicide screening in the state of Indiana. Samelson Aff. ¶ 5. It is Dr. Samelson's opinion that Ms. Peoples did not provide any information during her intake that warranted placing her on suicide watch and, even with her psychiatric history, her presentation upon her intake screening did not warrant a referral to mental health staff or placement on suicide watch. *Id.* Dr. Samelson's report states that drug and alcohol withdrawal in and of itself is not a

reason to place an individual on suicide watch. *Id.* Dr. Samelson's report also states that refusal of medication without more is not a known suicide risk factor. *Id.* ¶ 9.

Dr. Samelson opined that the assessment tools and protocols used by CCS to monitor Ms. Peoples's mental health status during opiate and alcohol withdrawal were reasonable, appropriate, and within the standard of care. *Id.* ¶ 6. It is Dr. Samelson's opinion that, because Ms. Peoples consistently answered "no" to the four behavioral health questions, those answers "raised no red flags which would warrant her placement on suicide watch or a referral to mental health staff." *Id.*

With regard to Ms. Peoples's previous reports of suicidal thoughts during her periods of incarceration in 2016, Dr. Samelson observed that, regardless of her motive in doing so, those reports show that Ms. Peoples "was not afraid of informing mental health and jail staff about any feelings of suicidal thoughts she might have been experiencing, yet she failed to do so in 2017." *Id.* ¶ 7. Dr. Samelson further opined that the fact that Ms. Peoples was on suicide watch in the Jail during previous incarcerations was not a reason to place her on suicide watch during her June 2017 incarceration because "[t]he patient's current presentation is a more important factor than whether or not they have previously been on suicide watch in determining whether or not they need to be placed on suicide watch." *Id.* ¶ 10.

Dr. Samelson's final conclusion, based on the information he reviewed, is that Ms. Peoples's suicide "was completely unforeseeable and unpreventable" and that "[t]he care provided to Ms. Peoples by medical staff at the Marion County Jail in June 2017 for her

mental health issues was reasonable, appropriate, and within the community standard of care." *Id.* ¶ 12.

**Edward A. Bartkus's Expert Testimony**

Edward A. Bartkus, M.D., FACEP, FP-C, is the EMS Medical Director at Indiana University Health Methodist Hospital and Assistant Professor of Clinical Emergency Medicine at Indiana University's School of Medicine. Dr. Bartkus reviewed the facts of this case, including, *inter alia*, Ms. Peoples's medical records and criminal history, as well as documents from the death investigation following her suicide.

Based upon his review of the record, Dr. Bartkus opined that the Jail's response was "rapid," "vigorous," and "impressive, both in the numbers of deputies and medical personnel, and the minimal time it took for them to begin arriving." Dkt. 102-14. Dr. Bartkus concluded to a reasonable degree of medical certainty that "Ms. Peoples was unfortunately unresuscitatable by the time the MCSO staff were notified." *Id.* He based this opinion on the fact that death from hanging progresses rapidly and Ms. Peoples was already in asystole when the AED was applied. *Id.* ("The fact that the AED apparently indicated 'no shock advised' means that the heart's electrical activity was determined to be either asystole ('flat line') or pulseless electrical activity."). According to Dr. Bartkus's report, "[a] hanging patient in asystole is rarely able to be resuscitated, and even more rarely with a 'good outcome.'" *Id.*

Dr. Bartkus's report states that the Jail staff responded appropriately to the emergency. Dr. Bartkus opined that CPR was started promptly and "[m]odern CPR no longer requires mouth-to-mouth or even bag-valve-mask ventilation for the first 3 cycles

of CPR (6 minutes). It is well known that chest compressions actively move gases in and out of the lungs, obviating the need for artificial ventilation early in the resuscitation." *Id.* Dr. Bartkus opined that the AED was applied promptly, and CPR was resumed immediately after the AED indicated that no shock was advised. *Id.*

**The Instant Litigation**

Ms. Peoples's mother, as personal representative of the Estate of Miranda Peoples, filed her complaint in this action on June 28, 2018, asserting claims under 42 U.S.C. § 1983 as well as various state law claims. She amended her complaint on October 10, 2018 to include additional factual allegations. The Medical Defendants and the MCSO Defendants each filed motions for summary judgment on July 26, 2019. Those motions are now fully briefed and ripe for ruling.

<u>Legal Analysis</u>

I.      **Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.     Federal Claims

Plaintiff asserts federal claims against the Sheriff, CCS, and the individual medical and corrections staff members under § 1983 for violation of Ms. Peoples's Fourth and/or Fourteenth Amendment rights based on their policies and procedures for identifying and protecting suicidal inmates, their failure to recognize Ms. Peoples as a suicide risk, their failure to prevent Ms. Peoples's suicide, and/or their failure to respond appropriately when she was found in her cell.  Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims brought pursuant to § 1983.

Before reaching the merits of Plaintiff's § 1983 claims, we turn first to address whether those claims must be analyzed under the Fourth or Fourteenth Amendment. Claims of a pretrial detainee who has not yet been the subject of a judicial determination of probable cause are governed by the Fourth Amendment.  *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (citing *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006)).  Once a judicial determination of probable cause has been made as to the charges against a person, a pretrial detainee's claims are analyzed under the Due Process Clause of the Fourteenth Amendment.  *Lopez*, 464 F.3d at 719.  Here, we take judicial notice of the fact that a probable cause determination was made in Ms. Peoples's criminal case on June 19, 2017, the same day that her intake screening was performed.  Therefore, because Plaintiff's claims all arise from conduct occurring after the probable cause determination was made, they are governed by Fourteenth Amendment standards.

An inadequate medical care claim under the Fourteenth Amendment is reviewed under an objective reasonableness standard.  *See Miranda v. Cty. of Lake*, 900 F.3d 335,

352 (7th Cir. 2018) (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).  In assessing such a claim, the court first determines whether the defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case."  *Id.* at 353.  This requires a pretrial detainee to "prove more than negligence but less than subjective intent—something akin to reckless disregard."  *Id.* (citations omitted).  At the second step, the court determines "whether the challenged conduct was objectively reasonable."  *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018).  In making this determination, the court is required to "focus on the totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable."  *Id.*

### A.     Individual Defendants

#### 1.     CCS Staff

##### i.     Nurse Daniels-Stringer

Plaintiff claims that Nurse Daniels-Stringer acted in an objectively unreasonable fashion when completing Ms. Peoples's Receiving Screening and initial CIWA and COWS assessments by failing to refer her for a mental health evaluation or place her on suicide watch despite having knowledge that she had a mental health history and was actively withdrawing from drugs and alcohol.  However, even in construing the facts in Plaintiff's favor, no reasonable jury could find that Nurse Daniels-Stringer acted with reckless disregard or in an objectively unreasonable fashion.

In performing Ms. Peoples's intake screening, Nurse Daniels-Stringer asked her about past physical and mental health issues and recorded on the intake form that Ms. Peoples had been diagnosed with chronic Hepatitis C on March 16, 2016, and an unspecified psychiatric disorder on January 10, 2013, about which she did not inquire further. Nurse Daniels-Stringer asked Ms. Peoples all the questions listed on the Receiving Screening form, including the suicide screening questions. Ms. Peoples responded "no" to every question, including whether she had a psychiatric history, had previously attempted suicide, showed signs of depression, or was expressing any suicidal thoughts. Nurse Daniels-Stringer noted on the form that Ms. Peoples was in the process of withdrawing from drugs and alcohol and thus placed her in the CIWA and COWS protocols so that she would receive additional monitoring and medication to address withdrawal symptoms. However, Nurse Daniels-Stringer answered "no" to the question regarding whether it appeared that Ms. Peoples was under the influence of drugs and alcohol at that time. Had she answered "yes," she would have been prompted by the form itself to determine whether Ms. Peoples was showing signs of withdrawal, and, had she then answered "yes" to that question, would have been required to refer Ms. Peoples for a mental health evaluation. She also performed Ms. People's initial CIWA and COWS assessments, concluding that she had minimal withdrawal symptoms and therefore did not require a mental health evaluation on that basis. Following completion of the Receiving Screening, Nurse Daniels-Stringer had no further involvement in Ms. Peoples's care.

Nurse Daniels-Stringer testified that many inmates do not divulge all their medical history during the Receiving Screening and often provide rote answers to the intake questions, particularly if, like Ms. Peoples, they have been waiting in intake for a prolonged period or have previously been incarcerated and thus know the questions they will be asked. Nurse Daniels-Stringer further testified that, due to time pressures at intake, she does not access an inmate's medical records from prior incarcerations to confirm that the information the inmate provides regarding their health history is accurate. Even so, it was not objectively unreasonable for Nurse Daniels-Stringer to follow the format of the Receiving Screening form or to rely on the information provided by Ms. Peoples to guide her decision regarding whether a mental health evaluation was necessary. The mere fact that Ms. Peoples had a mental health diagnosis three years prior does not render Nurse Daniels-Stringer's determination that she did not presently require a mental health evaluation objectively unreasonable. It was also reasonable for Nurse Daniels-Stringer to place Ms. Peoples in the withdrawal protocols to address the withdrawal symptoms she noted at intake. Although Plaintiff takes issue with the quality of those assessments, Nurse Daniels-Stringer's referral to the established protocols ensured that Ms. Peoples received frequent monitoring from nursing staff throughout her incarceration.

Plaintiff contends that "a reasonable jury could conclude that [Nurse] Daniels-Stringer purposefully chose to select the incorrect answers in the receiving screening, but account for some of those symptoms in the CIWA/COWS forms, in order to process [Ms. Peoples] more quickly through the intake process without having to involve mental

health." Pl.'s Resp. at 28–29. This is pure speculation on Plaintiff's part, unsupported by the evidence. Nurse Daniels-Stringer utilized the screening tools made available to her, which the Medical Defendants' expert, Dr. Samelson, testified were appropriate for assessing mental health status and suicide risk, and Ms. Peoples answered "no" to all the suicide screening and behavioral health questions. Nurse Daniels-Stringer placed Ms. Peoples on the CIWA and COWS protocols to address her withdrawal symptoms and ensure that she would be routinely monitored by nursing staff. These facts do not support a finding that Nurse Daniels-Stringer acted objectively unreasonably or with reckless disregard to Ms. Peoples's suicide risk. Accordingly, she is entitled to summary judgment.

### ii. Nurse Jones

Plaintiff claims that Nurse Jones acted objectively unreasonably during her CIWA and COWS assessment of Ms. Peoples when she denied Ms. People's request for additional Librium without consulting a physician before doing so.[8] Nurse Jones testified that she is unable to recall whether this interaction with Ms. Peoples came during the incarceration in question or during a prior incarceration, but viewing the facts in the light most favorable to Plaintiff, we assume that it occurred on June 26, 2017, the morning of Ms. People's suicide.

---

[8] By failing to address the issue in response to summary judgment, Plaintiff has abandoned her contention that Nurse Jones acted objectively unreasonably when she ignored Ms. Peoples's refusal of her medications on June 26, 2017.

This theory of liability was not raised in Plaintiff's First Amended Complaint and, therefore, on that basis need not be addressed here. It is well-settled that "[a] plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Nor is a plaintiff entitled to "create a genuine issue of material fact, thereby precluding summary judgment, by raising facts for the first time in response to defendant's motion for summary judgment which were not raised in the complaint." *Bassiouni v. Cent. Intelligence Agency*, No. 02 C 4049, 2004 WL 1125919, at *8 (N.D. Ill. Mar. 31, 2004) (collecting cases). Here, Plaintiff's First Amended Complaint includes no allegation that Nurse Jones's refusal to provide Ms. Peoples with Librium or to consult a doctor regarding her request violated Ms. Peoples's constitutional rights. Accordingly, Nurse Jones is entitled to summary judgment on this issue.

Plaintiff's claim against Nurse Jones fails on the merits as well. Nurse Jones testified that when Ms. Peoples asked her for Librium, the prescription had expired and Ms. Peoples's CIWA and COWS protocols had ended. Nurse Jones asked permission to take Ms. Peoples's vital signs to determine whether there was an issue that needed to be elevated to the medical provider, but Ms. Peoples refused and "cursed [her] out." Jones Dep. at 85–87. Nurse Jones testified that she did not communicate this request to a doctor because it was not warranted based on her personal physical assessment of Ms. Peoples. *Id.* at 87–88.

Nurse Jones's decision to withhold the Librium from Ms. Peoples was objectively reasonable because Ms. Peoples had by that time finished her withdrawal protocols and

the prescription had expired. *See Coleman v. Bailey*, No. 18-cv-732-jdp, 2019 WL 6700156, at *3 (W.D. Wis. Dec. 9, 2019) ("No reasonable jury could conclude that it was unreasonable to withhold medication that was no longer authorized by a prescription."). Considering the totality of facts and circumstances, it was also not objectively unreasonable to fail to communicate Ms. Peoples's request to a doctor, given Nurse Jones's assessment and the fact that the Librium was prescribed as part of the withdrawal protocols and those protocols had been completed. For these reasons, Plaintiff's claim against Nurse Jones cannot and does not survive summary judgment.

### iii.    Nurse Allen

Plaintiff next asserts that Nurse Allen acted objectively unreasonably by "reckless[ly] complet[ing]" Ms. People's CIWA and COWS protocols. Specifically, Plaintiff argues that it appears from the withdrawal protocol assessment forms that Nurse Allen recorded zeros and "no" answers by default and in one instance recorded a final tally of Ms. Peoples's score incorrectly. Summary judgment is not warranted, Plaintiff argues, because a reasonable jury could find, based on Ms. Peoples's presentation at the Jail (as reflected in her book-in photograph) and Ms. Hardy's testimony regarding her observations of Ms. Peoples's condition, that Nurse Allen was minimizing Ms. Peoples's withdrawal symptoms, preventing her from receiving necessary mental health treatment.

While the protocol assessments do appear to show that on two occasions Nurse Allen originally gave Ms. Peoples scores of "0" for each symptom and then changed some of the scores to reflect higher numbers, this in no way establishes recklessness. The relevance of the book-in photograph and Ms. Hardy's testimony is reduced by the fact

that the photograph was taken anywhere from one to three days prior to Nurse Allen's first assessment of Ms. Peoples, and Ms. Hardy conceded that she was never present when medical staff interacted with Ms. Peoples, preventing her from being able to say how Ms. Peoples had presented during those assessments. Moreover, the total scores Nurse Allen calculated based on her assessments of Ms. Peoples are higher than all but one of the scores other nurses gave her, which tends to belie the argument that Nurse Allen was minimizing her scores. It is true that Nurse Allen on one occasion incorrectly tallied Ms. Peoples's total score on a CIWA assessment as "4" when it should have been "5," but even if the correct total had been recorded, it would have made no difference in the mental health care Ms. Peoples received because scores from "0" to "8" are considered "[m]inimal or no withdrawal" and the CIWA assessment form advises only that a health care provider should be consulted for scores above "8." Dkt. 99-5 at 13. Based on these facts, no reasonable jury could find that Nurse Allen acted with knowing or reckless disregard in assessing Ms. Peoples's withdrawal symptoms.

Plaintiff also contends that there is conflicting testimony in the record regarding Nurse Allen's actions after finding Ms. Peoples hanged in her cell that creates genuine issues of material fact regarding the objective reasonableness of her response to the medical emergency. Nurse Allen testified that, upon hearing the emergency call, she responded immediately to Ms. Peoples's cell block, assisted in removing the ligature and helped to perform CPR once Ms. Peoples was removed from the cell. Deputy Gordy likewise testified that the nurse who came from the med pass (Nurse Allen) came into the cell to assist and that multiple nurses helped perform CPR once Ms. Peoples was moved

outside the cell.  Gordy Dep. at 33, 37–38.  Deputy Bragg testified that Nurse Allen entered Ms. Peoples's cell with them but, in answer to the question about what she was doing while the deputies tried to remove the ligature, he responded, "I don't know. Standing behind us."  Bragg Dep. at 44, 63.  He further testified that, while the purpose of having a nurse respond is to provide medical aid, he and Deputy Foxworthy, not Nurse Allen, started chest compressions and that he did not know whether Nurse Allen volunteered or attempted to get in the cell to provide aid.  *Id.* at 83.

Even assuming, as Deputy Bragg testified, that Nurse Allen simply stood back while he and Deputies Gordy and Foxworthy removed the ligature and was not the first person to provide medical aid once Ms. Peoples was laid on the floor, no reasonable jury could find that her overall response to the medical emergency was objectively unreasonable.  It is undisputed that she swiftly responded to the cell block when she heard the emergency call, inquired of inmates in the area regarding the nature and location of the emergency, and then ran to Ms. Peoples's cell.  Given that Deputies Bragg and Gordy both immediately began to work at removing the ligature, and that Deputy Foxworthy arrived approximately 30 seconds later to provide additional assistance, Nurse Allen's decision to allow them to continue their efforts without interference was not objectively unreasonable.  Similarly, it was not objectively unreasonable for Nurse Allen to have waited until Ms. Peoples was moved outside the cell to assist with chest compressions given Deputy Gordy's testimony that, with Ms. Peoples on the floor, it was too crowded for any nurse to fit inside the cell and Deputies Bragg and Foxworthy were already performing such measures in a manner that both Nurse Allen and Defendants'

expert, Dr. Bartkus, testified was appropriate.  Nurse Allen is also entitled to summary judgment in her favor.

## 2. MCSO Staff

Plaintiff claims that Deputy Williams acted objectively unreasonably by failing to refer Ms. Peoples for a mental health evaluation or place her in suicide segregation, despite his awareness of a report that she was suicidal, and that Deputies Gordy, Bragg, and Foxworthy acted objectively unreasonably by failing to adequately respond to Ms. Peoples's suicide.  The MCSO Defendants maintain that the undisputed facts establish on the merits that Plaintiff's federal claims against the deputies cannot succeed. and, even if Plaintiff could prove they acted objectively unreasonably toward Ms. Peoples, they are entitled to qualified immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted).  The inquiry has two parts: (1) whether a defendant violated a constitutional right and (2) whether the right was clearly established at the time of the violation.  *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citing *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012)).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Reichle*, 566 U.S. at 664 (quotation marks and citation omitted).  These questions may be addressed in either order.  *McComas*, 673 F.3d at 725.

"If a defendant asserts that [he or] she is entitled to qualified immunity, the plaintiff bears the burden of defeating the immunity claim." *Archer v. Chisholm*, 191 F. Supp. 3d 932, 942 (E.D. Wis. 2016) (citing *Betker*, 692 F.3d at 860). A plaintiff can show that law is clearly established and defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 723–24 (7th Cir. 2013). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743 (quotation marks and citation omitted).

We address the claims against the deputies in turn below.

### ii.   Deputy Williams

Plaintiff claims that Deputy Williams violated Ms. Peoples's constitutional rights by failing either to refer her for a mental health evaluation or to place her in suicide segregation pending such an evaluation despite receiving a report that Ms. Peoples was suicidal and knowing that she was experiencing drug and alcohol withdrawal symptoms. The MCSO Defendants rejoin that Deputy Williams's actions were not objectively unreasonable because, upon being informed of her suicidal intentions, he immediately spoke with Ms. Peoples about the report and she denied being suicidal. Further, in line with MCSO policy updates, he spoke with Ms. Hardy and reasonably determined that the

report was not credible. The MCSO Defendants further contend that, even if Deputy Williams acted unreasonably, he is entitled to qualified immunity.

Viewing the facts in the light most favorable to Plaintiff as we are required to do on summary judgment, the evidence shows that Deputy Williams observed Ms. Peoples exhibiting withdrawal symptoms on or about June 23, 2017 but did not contact the medical staff. The next day, June 24, 2017, he responded to an anonymous report that an unnamed inmate in Ms. Peoples's cell block was suicidal, and, later that same night, was told by Ms. Hardy that Ms. Peoples was suicidal after he discovered Ms. Hardy attempting to switch cells.

In response to the anonymous report, Deputy Williams and another deputy performed a welfare check and asked the inmates cell by cell for information as to the identity of the inmate who had made the report and the identity of the inmate believed to be suicidal, but no one provided this information. When Deputy Williams talked to Ms. Peoples during that check, she "stated that she was fine." Exh. 6 to Bair Decl.

Later that night Deputy Williams discovered Ms. Hardy attempting to switch out of the cell she shared with Ms. Peoples. Deputy Williams testified that, after being discovered, Ms. Hardy asked to switch cells and reported that Ms. Peoples was suicidal.[9] According to Deputy Williams, he immediately went to Ms. Peoples, who denied having thoughts of self-harm or being suicidal, saying simply that she just wanted to sleep. He

---

[9] Although Deputy Williams's testimony is somewhat confusing as to the exact content of the conversation, the interpretation of his testimony that is most favorable to Plaintiff is that Ms. Hardy affirmatively stated that Ms. Peoples was suicidal.

testified that he then followed up with Ms. Hardy who, he says, told him that she had no reason to believe that Ms. Peoples was suicidal; she just wanted her moved out of their cell. Ms. Hardy denies being the one who reported Ms. Peoples as suicidal but confirms that another inmate did make such a report and that deputies at one point came to speak with Ms. Peoples after the report was made. She does not know the substance of that conversation, however. Hardy Dep. at 67–68. Based on Ms. Peoples's response and Ms. Hardy's desire to switch cells, Deputy Williams determined the report was not credible and did not refer Ms. Peoples for a mental health evaluation or report the incident to the medical staff.[10] Two days later, Ms. Peoples committed suicide. Within that two-day period, Ms. Peoples saw nurses on several occasions for medication passes and deputies during clock rounds but never reported thoughts of self-harm or that she was suicidal.

Plaintiff does not claim that Deputy Williams's failure to contact mental health staff after observing Ms. Peoples experiencing withdrawal symptoms on June 23, 2017 or the manner in which he responded to the anonymous report on June 24, 2017 that an unnamed inmate in Ms. Peoples's cell block was suicidal were objectively unreasonable. Accordingly, we address only whether, given this background knowledge, his response to the report that Ms. Peoples was suicidal that was made either by Ms. Hardy or some other unidentified inmate later in the evening on June 24, was objectively unreasonable. For the following reasons, we hold it was not.

_____

[10] Likewise, the MCSO's internal investigation report reflects that Deputy Williams determined that the report was not credible because, based on Ms. Hardy's attempt to switch cells, he believed she "was trying to get Inmate Peoples reassigned to a different cell so Inmate Hardy wouldn't have to bunk with her." Exh. 6 to Bair Decl.

Whether it was Ms. Hardy or some other inmate who reported that Ms. Peoples was suicidal, there is no dispute that such a report was made. Deputy Williams testified that he immediately found Ms. Peoples and inquired as to whether she was having thoughts of self-harm and that she denied being suicidal.[11] Although Ms. Hardy was not privy to that conversation, she confirmed in her testimony that Ms. Peoples was visited by corrections staff following the report that she was suicidal. Ms. Hardy also confirmed that she was attempting to switch cells so she did not have to stay with Ms. Peoples and that she believes whoever made the report did so merely to get Ms. Peoples moved out of the cell block because inmates "play suicide on each other all the time" and "[w]hen somebody gets mad at somebody else, they'll call suicide on them." Hardy Dep. at 22.

In sum, when Deputy Williams received the report that Ms. Peoples was suicidal, he investigated the credibility of the report per MCSO policy, determining that it was not credible based on Ms. Peoples's denial, coupled with Ms. Hardy's confirmed desire to be separated from Ms. Peoples. Ms. Hardy's testimony buttresses the reasonableness of Deputy Williams's response as she confirms that she likewise believed that the report was merely a ploy, which she testified was a frequent occurrence in the Jail. Ms. Peoples did not commit suicide until two days after this report, during which period she saw nurses and deputies on several occasions during medication passes and clock rounds, but

---

[11] Deputy Williams testified that he also spoke with Ms. Hardy after speaking with Ms. Peoples, inquiring what reason she had for believing that Ms. Peoples was suicidal, and Ms. Hardy stated that she had no reason and simply did not want to share a cell with her. Williams Dep. at 50. Although Ms. Hardy denied reporting that Ms. Peoples was suicidal and thus that such a conversation with Deputy Williams ever occurred, she did confirm that she had attempted to switch cells earlier that night because she wanted to get out of Ms. Peoples's cell.

never reported having thoughts of suicide or self-harm. Based on these facts, at most, we can say that Deputy Williams should have known not to believe Ms. Peoples's denial. The Seventh Circuit has recognized, however, that "[such an] inference, if it leads anywhere, leads only to negligence," *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003), which is insufficient to meet the standard of objective unreasonableness. For these reasons, we hold that no reasonable jury could find that Deputy Williams responded objectively unreasonably in violation of Ms. Peoples's constitutional rights. He is therefore entitled to summary judgment and we need not and do not address his qualified immunity defense.

### ii. Deputies Bragg, Gordy, and Foxworthy

Plaintiff also claims that the emergency response by Deputies Bragg, Gordy, and Foxworthy, after finding Ms. Peoples hanged in her cell, was objectively unreasonable, particularly with regard to their failure to utilize the cutting tool to remove the ligature and failure to perform rescue breaths during CPR efforts. For the reasons detailed below, we disagree with Plaintiff's theory of liability.

The undisputed evidence shows that when the deputies responded to the medical emergency in Ms. Peoples's cell, they were unaware that they were responding to an attempted suicide. Accordingly, it was not objectively unreasonable for them to have failed to procure the cutting tool before responding to the scene. Once Ms. Peoples was discovered, Deputies Bragg and Gordy immediately began working together in an effort to untie the ligature. Given that there was no cutting tool within close proximity, their decision to immediately attempt to free Ms. Peoples as opposed to leaving her in order to

49

retrieve the cutting tool was not objectively unreasonable. Their failure to radio for someone else to retrieve the tool while continuing their efforts to free Ms. Peoples would at best be negligence, but it in no way demonstrates knowing or reckless indifference to the situation they confronted. *See McCann*, 909 F.3d at 886. When Deputy Foxworthy arrived in Ms. Peoples's cell shortly thereafter, he immediately instructed the other deputy with him to retrieve the cutting tool and went to assist Deputies Bragg and Gordy. No reasonable jury could find such a response objectively unreasonable.

Nor was the manner in which the deputies performed CPR objectively unreasonable. Plaintiff claims that the deputies' initial application of CPR violated Ms. Peoples's constitutional rights because they performed only chest compressions and not mouth-to-mouth breathing before medical help arrived with an AED and other equipment. However, the MCSO Defendants' expert. Dr. Bartkus, testified that modern CPR training no longer requires mouth-to-mouth breathing for the first six minutes of CPR. Dkt. 102-14 at 14. Plaintiff has provided no contradictory expert testimony. In this case, medical staff arrived and began administering rescue breaths through an Ambu bag within that six-minute period. Given this undisputed testimony, no reasonable jury could find that the manner in which the MCSO Defendants performed CPR was objectively unreasonable in contravention of Ms. Peoples's constitutional rights.

Plaintiff attempts to make much of the fact that the deputies' failure to use the cutting tool to remove Ms. Peoples's ligature and failure to give rescue breaths during CPR contravened their training. However, the Constitution does not require corrections personnel to follow all jail regulations to the letter when responding to a medical

emergency; all that is required is that their response be objectively reasonable, which the response here clearly was. Because we have found that Deputies Bragg, Gordy, and Foxworthy acted in an objectively reasonable manner in responding to Ms. Peoples's medical emergency and are entitled to summary judgment on that basis, we need not address their qualified immunity defense.

### B. *Monell* Claims

With regard to Plaintiff's claims against CCS[12] and the Sheriff, these entities may be held liable only for injuries resulting from unconstitutional policies or practices. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). Under *Monell*, CCS and the MCSO may be held liable for money damages under § 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citations omitted). An unconstitutional policy can include both implicit policies as well as a gap in expressed policies. *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016).

---

[12] CCS is a private corporation that acts under color of state law by contracting to perform a government function, to wit, providing medical care to correctional facilities. As such, CCS is treated as a government entity for purposes of claims brought pursuant to § 1983. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity.") (citation omitted).

To prevail, a Plaintiff must show that the alleged policy or custom is "the moving force of the constitutional violation," *Monell*, 436 U.S. at 694, and present "competent evidence" that the custom or policy is in fact widespread. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006). "*Monell* liability is possible even if no individual official is found deliberately indifferent." *Miranda*, 900 F.3d at 344 (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*).

### 1.    CCS

Plaintiff argues that CCS maintained a custom, policy, and practice that fails to provide inmates with sufficient access to substantive medical treatment. Specifically, Plaintiff argues that a reasonable jury could believe that the medical staff at CCS was prevented from providing Ms. Peoples constitutionally necessary medical and mental health treatment due to her assessments under the CIWA and COWS protocols being disjointed and not immediately uploaded into CCS's electronic system to allow for nursing staff and medical providers to review Ms. Peoples's medical records. Although not entirely clear, we understand Plaintiff also to argue that CCS had a custom or practice of condoning its employees' inaccurate and unreliable assessments of inmates' withdrawal symptoms.

In support of her claim against CCS, Plaintiff cites the Seventh Circuit's *en banc* opinion in *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372 (7th Cir. 2017), a case involving a deliberate indifference *Monell* claim brought by the estate of Mr. Glisson, a chronically ill inmate who died while in custody. In *Glisson*, the plaintiff claimed that Corizon, the prison medical provider, caused Mr. Glisson to receive constitutionally

deficient care for his complex medical issues because it failed to have a medical coordination policy in place which resulted in, *inter alia*, a lack of a comprehensive treatment plan to address his chronic care needs. *Id.* 375–76. The court held that a reasonable jury could infer that Corizon made a deliberate decision not to have such a policy because it was aware of, but declined to adopt, certain IDOC guidelines which specifically mandated a treatment plan for cases involving chronic medical issues. *Id.* at 380. The court further held that, based on this evidence, a jury could find that Corizon was deliberately indifferent to an "obvious" need for protocols for treating chronically ill inmates. *Id.* at 382.

We agree that, as was true regarding the obviousness of the risk at issue in *Glisson*, "[o]ne does not need to be an expert," *id.*, to know that failing to have adequate mental healthcare and suicide screening procedures for pretrial detainees is likely to result in constitutional violations. The evidence before us, however, is that there *were* policies in place intended to prevent such constitutional harm, including the required intake screening, which included a suicide screening section, as well as the CIWA and COWS protocols. Plaintiff takes issue with CCS's failure to ensure that the CIWA and COWS assessment information was immediately uploaded onto CCS's electronic system so as to be reviewable by all medical staff, but there is no evidence that such a failure was the "moving force" behind the harm at issue here. There is simply no evidence that, had those assessments been contemporaneously uploaded for viewing, Ms. Peoples would have been given a mental health evaluation or placed on suicide watch as each of those assessments indicated that Ms. Peoples was experiencing minimal withdrawal symptoms

and had repeatedly answered "no" to each of the four Behavioral Health Screening Questions.

Nor is there evidence from which a reasonable jury could conclude that CCS was aware that the screening procedures in place were either causing inmates harm or were likely to cause harm in the future. The undisputed expert testimony is that the Receiving Screening form and the CIWA and COWS protocols in use at the jail are appropriate and reasonable screening tools to assess suicide risk and address drug and alcohol withdrawal. Plaintiff argues that, given Ms. Hardy's testimony regarding her observations of Ms. Peoples's condition, CCS's nursing staff must have been inaccurately completing the CIWA and COWS assessments. Ms. Hardy concedes, however, that she was never present when Ms. Peoples was evaluated by nursing staff and therefore does not have personal knowledge of the manner in which Ms. Peoples presented to medical staff during her assessments. Importantly, these assessments were conducted by several different nurses, not just the defendants herein, all of which consistently reflected scores of minimal to no withdrawal symptoms. Accordingly, as addressed in more detail above with regard to the claims against the individual defendants, there is insufficient evidence to conclude that the CCS nursing staff inaccurately completed Ms. Peoples's assessment forms, much less that any such failures were so widespread so as to be considered a well-settled custom or practice condoned by CCS.

For these reasons, CCS is entitled to summary judgment on Plaintiff's *Monell* claim.

## 2. The Sheriff

Plaintiff claims that several of the Sheriff's widespread customs and practices caused Ms. Peoples constitutional injury, including the MCSO's deferral to CCS's system by which medical staff does not share with corrections staff information regarding inmates' mental health issues or suicide risk; condoning corrections staff members' inattention to inmates during clock rounds; failure to inform inmates about suicide risk factors and prevention; and inadequate training of Jail staff on suicide prevention and emergency response.

The Sheriff is entitled to summary judgment as to Plaintiff's challenge to the MCSO's deferral to CCS with regard to sharing information related to inmates' medical records. There is no evidence that Jail staff's not having access to Ms. Peoples's medical history was a "moving force" behind Ms. Peoples's suicide, or her failure to receive a mental health consultation in this case. Likewise, there is no evidence that any lack of training on emergency response techniques caused the harm in question. The MCSO Defendants' expert, Dr. Bartkus, opined that "Ms. Peoples was unfortunately unresuscitatable by the time the MCSO staff were notified" of her medical emergency. Dkt. 102-14. Plaintiff has presented no evidence to contradict this expert opinion. Accordingly, we find no inadequacies in the Sheriff's training on the use of the cutting tool and/or CPR techniques caused Ms. Peoples to suffer constitutional injury.

With regard to Sheriff's alleged practice of failing to provide pretrial detainees and inmates information regarding suicide risk factors and prevention, the evidence shows that, at intake, Ms. Peoples was shown the Jail's suicide prevention informational video

and was given the Inmate Handbook which included information prohibiting self-harming or aggressive behavior and instructs inmates to seek medical help for physical or mental health issues.  Ms. Peoples's understanding of the Jail's suicide hotline is also demonstrated by the fact that she used the hotline during previous periods of incarceration to report thoughts of self-harm.  Although Ms. Hardy claims that she was not provided information regarding suicide risk and prevention, this contention is belied by the fact that she previously utilized the suicide hotline to seek assistance when she felt her life was at risk from other inmates.  Accordingly, Plaintiff has failed to establish that the Sheriff had a widespread practice of failing to inform pretrial detainees and inmates of available suicide-related resources that caused constitutional harm in this case.

Plaintiff also claims that the Sheriff condones a custom or practice of inattention and indifference on the part of its deputies during clock rounds, pointing to Ms. Hardy's testimony regarding the deputies' failures to address the condition of their cell, Ms. Peoples's frequent vomiting, and the bullying she claims that Ms. Peoples suffered at the hands of other inmates.  Initially, we note that Ms. Hardy herself has testified that she never reported Ms. Peoples as suicidal or reported the instances of bullying to any corrections official because she did not believe it was a serious issue.  In any event, one inmate's testimony is insufficient to support a conclusion that a widespread custom and practice of indifference on the part of the deputies existed in the Jail resulting in the provision of constitutionally insufficient medical care that led to Ms. Peoples's suicide. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (holding that a plaintiff must show that

a custom or practice is "so persistent and widespread as to practically have the force of law").

There is also insufficient evidence to establish that such a custom or practice, even if it existed, was the "moving force" behind Ms. Peoples's suicide as opposed to a contributing factor. Here, Ms. Peoples was seen by nursing staff multiple times per day throughout her withdrawal protocols and up through the day of her suicide and none of the nurses observed that Ms. Peoples was experiencing anything other than minimal withdrawal symptoms or noted that she was expressing thoughts of self-harm. "[I]t is not enough to show that a widespread practice or policy was a *factor* in the constitutional violation; it must have been the *moving force*." *Johnson v. Cook County*, 526 Fed. App'x 692, 696 (7th Cir. 2013). Plaintiff has failed to make such a showing here.

Finally, Plaintiff argues that the Sheriff failed to adequately train his deputies on suicide risk factors and prevention. Inadequate police training can serve as the basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Deliberate indifference exists where the defendant (1) failed 'to provide adequate training in light of foreseeable consequences'; or (2) failed 'to act in response to repeated complaints of constitutional violations by its officers.'" *Miranda*, 900 F.3d at 345 (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029–30 (7th Cir. 2006)).

Here, while Plaintiff references the fact that prior suicides have occurred in the Jail, she has failed to present any facts to support an inference that the circumstances

surrounding those suicides are similar to those pertaining to Ms. Peoples's or that those suicides were causally linked to a failure to train such that the Sheriff could be found to have acted with deliberate indifference to a known training deficiency. Accordingly, we turn to address whether Plaintiff has presented sufficient evidence from which a reasonable jury could find that the Sheriff failed to provide adequate training in light of foreseeable consequences.

There can be no dispute that it is foreseeable that corrections staff will be confronted with inmates at risk for suicide. The evidence establishes that the Sheriff trains his deputies annually on suicide awareness and prevention. In this lawsuit, Plaintiff focuses on two particular alleged deficiencies in the MCSO's training—its failure to teach deputies that signs of drug and alcohol withdrawal can overlap with signs of suicide risk factors and its failure to adequately train deputies in the manner in which they are to address third party reports that an inmate is suicidal. Because a reasonable jury could conclude that the Sheriff would have to know that his deputies would be required to regularly respond to inmates exhibiting symptoms that could be attributable to drug or alcohol withdrawal and/or a risk of self-harm and that they would be required to respond to third party reports of suicidal inmates, a reasonable jury could also find that the need for training in these areas was obvious. The Sheriff is nevertheless entitled to summary judgment on Plaintiff's failure-to-train claim because Plaintiff has failed to adduce evidence to support a finding that the Sheriff failed to provide such training to its deputies or that any such failure caused Ms. Peoples's constitutional injury.

Plaintiff relies on the testimony of Deputy Williams to support her contention that the Sheriff failed to train his deputies in these areas. She first points to Deputy Williams's assertion that he was not taught by the MCSO that the symptoms of withdrawal and suicide may overlap. Williams Dep. at 110, 111. However, the MCSO's training materials specifically state that inmates are at a higher risk of suicide when they are intoxicated or detoxing from drugs and alcohol. Exh. 2 to Martin Dep. While Deputy Williams testified that he does not remember being shown the training document containing that information, testimony that one deputy on one occasion may not have been provided this information is insufficient to establish that the Sheriff had, at the time of Ms. Peoples's death, a policy, practice, or custom of failing to train its deputies regarding the connection between drug or alcohol withdrawal and suicide.

With regard to training on reports regarding suicidal inmates, Deputy Williams testified that, at the time of Ms. Peoples's suicide, it was the practice or policy in the Jail to automatically send any inmate who expressed thoughts of self-harm to suicide segregation, regardless of the inmate's credibility, but to investigate and assess the credibility of third party claims that another inmate was suicidal before sending that inmate to suicide segregation. Williams Dep. at 18–21. The evidence establishes that this policy or practice was enacted to combat abuse of the suicide hotline by inmates falsely reporting other inmates as suicidal, which caused overcrowding in the suicide segregation area and placed inmates who were not actually suicidal into segregation thereby subjecting them to restrictions unnecessarily. To assess credibility, Jail deputies were to question both the individual who was reported by a third party as suicidal and

also the inmate who made the report to determine if there was an ulterior motive for doing so. Martin Decl. ¶¶ 17–19. Although Deputy Williams testified that he had not been trained by the MCSO with regard to the manner in which such a credibility investigation was to be performed, he stated that, in such a situation, he would speak with the inmate reported as suicidal as well as the inmate who made the report to determine the basis for the belief that the other inmate was suicidal and whether that inmate had anything to gain by making such a report. *Id.* at 20–23.

Plaintiff has presented no developed argument to establish that the Sheriff's policy or practice of assessing the credibility of third-party reports of suicidal inmates by personally investigating the motivations of the parties involved is constitutionally deficient. She argues instead that Deputy Williams was not adequately trained by the Sheriff in the manner in which he was to assess credibility. However, his testimony regarding the way he regularly did so comports with the manner in which the Sheriff claims he trained his deputies. There is no evidence, therefore, that any lack of training affected his actions in responding to the third-party report that Ms. Peoples was suicidal or was the "moving force" behind any constitutional violation. Plaintiff's failure-to-train claim therefore cannot survive summary judgment.

For these reasons, the MCSO is entitled to summary judgment on Plaintiff's *Monell* claim.

## III.    State Law Claims

Plaintiff has also alleged several claims under state law, including claims of intentional infliction of emotional distress, negligent infliction of emotional distress and

negligence against Deputy Williams as well as wrongful death, survival act, failure to train, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence claims against the Sheriff. Defendants argue that they are entitled to summary judgment on the state law claims alleged by Plaintiff because they are all barred by the Indiana Tort Claims Act, Indiana Code § 34-13-3 ("ITCA"), or common law immunity.

We turn first to address the state law claims against Deputy Williams. The ITCA provides that "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." IND. CODE § 34-13-3-5(b). Deputy Williams argues that he is immune from all state law claims alleged against him in this lawsuit because at all relevant times he was acting within the scope of his employment. Plaintiff has failed to respond to this argument and has likewise failed to present any evidence establishing that Deputy Williams was at any point acting outside the scope of his employment. Accordingly, Deputy Williams is immune from the state law claims alleged against him and is entitled to summary judgment as to those claims.

The Sheriff argues that Plaintiff's state law claims against him are likewise barred by the ITCA. Specifically, the Sheriff relies on what is "commonly referred to as 'law enforcement immunity….'" *F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 138 (Ind. 2013). The law enforcement immunity of the ITCA provides, "A governmental entity … is not liable if a loss results from … [t]he adoption and enforcement of or failure to adopt or enforce … a law (including rules and regulations) …." IND. CODE § 34-13-3-3(8). To

establish law enforcement immunity, the action being challenged must "be one in which government either compels obedience to laws, rules, or regulations or sanctions or attempts to sanction violations thereof." *Davis v. Animal Control—City of Evansville*, 948 N.E.2d 1161, 1164 (Ind. 2011) (quotation marks and citation omitted).

Law enforcement immunity encompasses actions related to the enforcement of a statute as well as rules and regulations, thereby immunizing "a variety of administrative and executive functions..." *King v. Northeast Sec., Inc.*, 790 N.E.2d 474, 482 (Ind. 2003). Law enforcement immunity "attaches when the governmental activity involves the adoption and enforcement of laws, rules, or regulations (or the failure to do so) 'that falls within the scope of the entity's purpose or operational power' and are, thus, 'within the assignment of the governmental unit.'" *Cento v. Marion Cty. Sheriff's Office*, No. 1:17-cv-00431-TWP-DLP, 2018 WL 3872221, at *4 (S.D. Ind. Aug. 15, 2018) (quoting *King*, 790 N.E.2d at 482, 483).

In *Cento v. Marion County Sheriff's Office*, our colleague, Judge Pratt, recently held that law enforcement immunity applied in a case involving a pretrial detainee to bar a wrongful death claim against the MCSO based on its "fail[ure] to monitor or implement existing procedures and protocols" regarding the proper evaluation of inmates for suicidal tendencies and to prevent potentially suicidal inmates from committing suicide. *Id.* at *4. In light of the evidence presented in *Cento* regarding the MCSO's statutory responsibility for the care and custody of its inmates, whether pretrial detainees or otherwise, Judge Pratt held that "[t]he rules and regulations of the MCSO … for the protection of inmates against suicide, and the enforcement thereof, fall squarely within the scope of the

MCSO's … operational power and purpose" and that the plaintiff's wrongful death claim based on the failure to develop and/or monitor or implement such procedures and protocols was therefore barred by the ITCA's law enforcement immunity. *Id.* at *5.

In line with the analysis in *Centro*, we also hold that law enforcement immunity bars Plaintiff's state law claims against the Sheriff in this lawsuit. Indiana Code § 36-2-13-5(a)(7)[13] "sets forth the duty of the Sheriff to take care of the county jail and the prisoners there" and this statute "charges the sheriff with a duty to exercise reasonable care to preserve his prisoner's health." *Strayer v. Dearborn Cty. Sheriff*, 4:12-cv-00098-RLY-TAB, 2016 WL 1188056, at *4 (S.D. Ind. Mar. 28, 2016) (quotation marks and citations omitted). To enforce these mandates, the Sheriff has adopted many rules, regulations, and protocols to identify, evaluate, and aid suicidal inmates within the Sheriff's care. The Indiana Jail Standards also mandate that the Sheriff adopt specific regulations on conducting clock rounds, supervising suicidal inmates, and maintaining a suicide prevention program approved by medical staff, all of which the MCSO has implemented. *See* 210 IND. ADMIN. CODE 3-1-14 and 20. The Sheriff has also adopted the "Inmate Handbook" which applies to all detainees/inmates at that the Jail and contains enumerated rules which expressly prohibit, *inter alia*, "causing injury to oneself" and "[c]omitting or attempting to commit … a violent or disruptive act." Exh. 6 to Martin Decl. at MCSO_002456-MCSO_002457.

---

[13] Indiana Code § 36-2-13-5(a)(7) provides that "[t]he sheriff shall … take care of the county jail and the prisoners there."

As in *Centro*, Plaintiff's state law claims are based on the Sheriff's failure to properly implement and adequately monitor the rules and regulations related to the identification and protection of suicidal inmates that the Sheriff has adopted to enforce these Indiana statutes. Because such rules and regulations are clearly within the scope of the Sheriff's "operational power and purpose," the ITCA's law enforcement immunity applies and the Sheriff is therefore entitled to summary judgment on Plaintiff's state law claims.

## III. Conclusion

For the reasons detailed above, Defendants' Motions for Summary Judgment [Dkt. 98 and Dkt. 100] are <u>GRANTED</u>. The Clerk is directed to substitute Defendant Kerry J. Forestal, in his official capacity as Sheriff of Marion County, for Defendant John Layton in the case caption. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____3/26/2020_____        _Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Andrea Lynn Ciobanu
CIOBANU LAW, PC
aciobanu@ciobanulaw.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Stephanie V. McGowan
FROST BROWN TODD LLC (Indianapolis)
smcgowan@fbtlaw.com

Anthony W. Overholt
FROST BROWN TODD LLC (Indianapolis)
aoverholt@fbtlaw.com